Marc E. Albert, No. 345181
Tracey M. Ohm, No. 982727
Joshua W. Cox, No. 1033283
STINSON LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, DC 20006
Tel. (202) 785-3020
Fax (202) 572-9999
marc.albert@stinson.com
tracey.ohm@stinson.com
joshua.cox@stinson.com
*Proposed Attorneys for*
*Stanton Glenn Limited Partnership,*
*Debtor and Debtor-In-Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: ) | |
| ) | Case No. 21-00261 |
| STANTON GLENN LIMITED PARTNERSHIP, ) | Chapter 11 |
| ) | |
| Debtor and Debtor In Possession ) | |

**DECLARATION OF TINA SHAW IN SUPPORT OF**
**BANKRUPTCY FILING AND FIRST DAY MOTIONS**

Tina Shaw, as Chief Financial Officer of Stanton Glenn Limited Partnership, under penalty of perjury states the following:

1.  I am, and, at all relevant times have been, the Chief Financial Officer ("CFO") of Stanton Glenn Limited Partnership (the "Debtor"), and I am over the age of 18, mentally competent and make this declaration in support of the Debtor's Chapter 11 Bankruptcy filing and related first day motions.

CORE/3521957.0002/170551735.1

2. As CFO, I am familiar with the Debtor as well as the general business and financial affairs of the Debtor. The statements set forth below are true to the best of my personal knowledge and if called to testify to those statements, I would do so competently.

3. This Declaration is submitted in support of factual allegations contained in the following motions, filed contemporaneously with this Declaration.[1]

- Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Granting Adequate Protection ("Cash Collateral Motion")
- Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105 and 364 Approving Post-Petition Financing and Continuing Existing Credit Agreement ("DIP Financing Motion")
- Motion for Order Approving Debtor's Method of Furnishing Adequate Assurance of Payment for Post-Petition Utility Services ("Utilities Motion")
- Motion for Order Authorizing Debtor to Maintain Pre-Petition Bank Account and Establishing Procedures for Transfer of Housing Choice Voucher Program Payments to Debtor-In-Possession Bank Account ("Bank Account Motion")

(together, the "First Day Motions").

**OMNIBUS STATEMENT OF FACTS IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

4. On October 29, 2021, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), which case is pending before the United States Bankruptcy Court for the District of Columbia (the "Bankruptcy Court").

5. Debtor is a single asset real estate limited partnership organized under the laws of the District of Columbia with a principal place of business located in the District of Columbia.

---

[1] All capitalized terms not defined in this Declaration have the same meanings ascribed to them in the corresponding pleadings.

2

6. The Debtor owns a 100 percent fee simple interest in a 379-unit Low Income Tax Credit ("LIHTC") and market rate multifamily apartment complex consisting of 1, 2, 3, and 4 bedroom units located at 3040-3098 Stanton Road S.E. Washington, DC 20020 known as "Stanton Glenn Apartments" (the "Property"). The Debtor rents apartments to low income tenants, many of whom receive housing subsidies through the Housing Choice Voucher Program ("HCVP") run by the District of Columbia Housing Authority ("DCHA") and, by meeting certain standards of the United States Department of Housing and Urban Development ("HUD"), receive low income tax credits through HUD's LIHTC program. The monthly HCVP rental payments are expected to be paid next to the Debtor on Nov 2-4, 2021.

7. As noted above, I am the Chief Financial Officer of the Debtor. Joseph G. Kisha ("Mr. Kisha") serves as the Debtor's sole limited partner and possesses an ownership interest in the Debtor of 99.991%. Glen Development, an entity 100% owned by Mr. Kisha, serves as general partner of the Debtor with an ownership interest of 0.009%.

8. The appraised value of the Property, based on approved 2019 HUD Fair Market Rents, is $40 million. The Debtor has very significant equity in the Property. The secured debt encumbering the Property is approximately $20.4 million.

9. Prior to the filing of Debtor's bankruptcy, the Debtor executed an Agreement to Purchase Real Estate ("Sale Agreement") for sale of the Property to Concord Communities LLC for the purchase price of $39,500,000.00. As part of the terms of the Sale Agreement, the Property purchaser has already advanced cash totaling $2 million, which is anticipated to convert to a full deposit under the Sale Agreement once certain contingencies expire and buyer approvals are provided on November 3, 2021. The Debtor plans to expeditiously pursue Bankruptcy Court

approval for sale of the Property and will be using best efforts to close on sale of the Property by the end of the year.

10. The Covid-19 pandemic has caused significant disruptions to the Debtor's apartment business at the Property. Many tenants at the property have been unable to pay rent through the pandemic. Relief efforts aimed at preserving the public health, including a moratorium on evictions, have limited the Debtor's ability to adequately address loss of income due to tenants' inability to pay rent. As a result, the Debtor is currently operating at a shortfall as rents are not able to adequately cover expenses associated with operating the Property.

11. Following issuance of previous default letters, on September 30, 2021, the primary secured creditor, Greystone Funding Corporation ("Secured Creditor"), sent the Debtor a Notice of Default and Acceleration informing the Debtor that its secured loan was in default for failing to timely make its required payments due in accordance with the note and mortgage/deed of trust securing the Debtor's Federal Housing Authority-insured loan. In the notice the Secured Creditor threatened the Debtor with various collection actions and remedies based on the asserted defaults, and notified the Debtor that pursuant to the terms of Secured Creditor's deed of trust, it was exercising its right to accelerate the loan. Additionally, the District of Columbia Water and Sewer Authority previously asserted liens against the Property, with the total balance owing for water utilities believed to currently be approximately $1,351,214.19. Numerous other Certificates of Delinquent Costs for fines asserted against the Property have also been filed by the D.C. Department of Consumer & Regulatory Affairs totaling approximately $26,000, approximately $6,000.00 of which is believed to be a duplicate.

12. Based on the foregoing, the Debtor has filed for Chapter 11 bankruptcy relief in order to effectuate a successful sale of the Property and liquidation of the Debtor's assets once that sale has been consummated.

## DECLARATION IN SUPPORT OF FIRST DAY MOTIONS

13. As a result of my first-hand experience, and through my review of various materials and information, discussions with other of the Debtor's executives and staff, and discussions with the Debtor's outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in its First Day Motions, (b) the deleterious effects upon the Debtor of not obtaining such relief and (c) the immediate and irreparable harm to which the Debtor will be exposed immediately following the Petition Date unless the relief requested in the First Day Motions is granted without delay.

14. I submit this Declaration in support of the Petitions and First Day Motions filed with the Court in connection with the commencement of this case.

15. I participated in preparing and have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

16. The relief sought in the First Day Motions will minimize the adverse effects of this Chapter 11 case on the Debtor and result in maximum creditor recoveries while preserving the health and safety of the Property's tenants. I believe that the relief sought in each of the First

Day Motions is necessary to enable the Debtor to operate effectively in Chapter 11 as debtor in possession and maximize the value of its assets for the benefit of stakeholders.

**Cash Collateral Motion**

17.     As stated in the Cash Collateral Motion, the Debtor requires the use of the Cash Collateral, consisting of rents derived from the Property, in order to continue to operate, preserve and maintain the Property, and to comply with its duties as a debtor-in-possession. Unless the Debtor is permitted to use the Cash Collateral, it and its tenants will be irreparably harmed because it will be unable to operate and manage the Property and preserve and maintain its going concern value. The Debtor requires the use of Cash Collateral for the payment of, among other things, adequate protection payments, operating expenses, utilities expenses, maintenance and security expenses, U.S. Trustee Fees, and other expenses as more fully set forth in the Budget. The Debtor's use of Cash Collateral to operate its business will protect the value of the Property and preserve the health and safety of tenants residing at the Property until the Property is sold.

18.     As CFO of the Debtor, I assisted in preparing and have reviewed the budgets (18 day and 90 day) attached to the Cash Collateral Motion, which are good faith estimates of projected income and expenses of the Debtor for the next 3 months. The Debtor will maintain a detailed accounting of all expenses funded by the cash collateral generated by its business operations.

**DIP Financing Motion**

19.     The Debtor needs immediate access to DIP Financing to fund its business pending completion of the anticipated sale of the Property.

20.     As seen in the budgets presented in the Debtor's Cash Collateral Motion, use of rents derived from the Property are not expected to cover the carefully budgeted operational

expenses of the Debtor while working to complete sale of the Property in the bankruptcy, with shortfalls each month ranging from approximately $81,000 to $157,000. The proposed DIP financing is necessary to ensure the Debtor is able to meet its operational expenses presented in the budget and to preserve the health and safety of tenants residing at the Property until the Property is sold.

21. On February 12, 2021, Mr. Kisha and the Debtor entered into a Commercial Balloon Credit Line Promissory Note (the "Note"), a copy of which is attached as Exhibit A to the DIP Financing Motion. Pursuant thereto, Mr. Kisha has advanced $487,803.19 to the Debtor prepetition. Mr. Kisha has agreed to continue his credit agreement with the Debtor and to provide debtor-in-possession financing to the Debtor in accordance with the terms of the Note (the "DIP Facility").

22. As demonstrated in the terms presented in the DIP Financing Motion, the terms of the DIP Facility negotiated by the Debtor are on the most favorable terms available to Debtor, are reasonable under the circumstances, and the Debtor believes that, given the notable absence of any alternative source of financing, approval of the DIP Facility is in the best interests of the Debtor and its bankruptcy estate.

23. After reviewing the proposal submitted by Mr. Kisha, the Debtor determined, in the exercise of its business judgment, that the financing offered by Mr. Kisha was in the best interests of its estate. In the absence of immediate authorization for the entry into a debtor-in-possession financing facility, the Debtor may be unable to continue operating, and could suffer immediate and irreparable harm, including loss of the opportunity to consummate a sale of its business as a going concern.

24. The Debtor submits that a working capital facility of the type needed in this case could not have been obtained on an unsecured basis from any other source. The potential sources of an adequate credit facility for the Debtor, obtainable quickly and on reasonable terms, were extraordinarily limited.

25. Given the nature of the Debtor's business, it is crucial that the Debtor continues to function as a going concern. As such, in order to preserve the value of the Debtor's estate, access to substantial credit is necessary to meet the substantial day-to-day operating costs associated with the Debtor's expenses. Access to sufficient cash, therefore, is critical to the continued viability of the Debtor's business.

**Utilities Motion**

26. The Debtor's day-to-day operations require the use of water, electric, telephone (including telephone and data services), and other services provided by its utility companies. As a large apartment complex serving low income residents of the District, maintaining utility service is critical to maintaining the Debtor's business as a going concern until it is sold, ensuring the Property is being maintained in accordance with the D.C. Housing Code, and is necessary to preserving the health and safety of residents residing at the Property. Interruption of the utility services would disrupt the Debtor's ability to conduct business.

27. As presented in the Utilities Motion, the Debtor intends to pay post-petition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner. The Debtor expects that its cash flow from operations, cash on hand, and availability of DIP Financing will be sufficient to pay post-petition obligations related to its utility service.

28. Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtor proposes to deposit into a newly created, segregated, interest-

bearing account (the "Adequate Assurance Deposit Account") within twenty days of the Commencement Date, $34,925, an amount equal to the estimated aggregate cost for two weeks of utility service, calculated as a historical average over the past six months (the "Adequate Assurance Deposit"). The Adequate Assurance Deposit will be held for the benefit of the Utility Providers during the pendency of this Chapter 11 case.

29. The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business (the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.

**Bank Account Motion**

30. Monthly the Debtor receives a portion of its income from rental payments made directly from Property tenants. However, many tenants of the Property receive housing subsidies through the Housing Choice Voucher Program ("HCVP") run by the District of Columbia Housing Authority ("DCHA"). Through the HCVP, the Debtor receives approximately $172,000 - $200,000 of income from DCHA each month.

31. Prior to the Petition Date, the Debtor maintained a total of five (5) separate bank accounts for various business purposes at Wells Fargo Bank, John Marshall Bank, and Sandy Spring Bank. Included in these accounts is the Debtor's account maintained with Sandy Spring Bank (Account No. xxxx1438) (the "HCVP Account"). The HCVP Account is registered with DCHA as the account authorized to receive electronic deposits of monthly housing subsidy payments due to the Debtor under the HCVP.

32. In order to comply with the UST's guidelines, the Debtor is currently in the process of opening DIP bank accounts with Sandy Spring Bank, transferring Debtor's cash assets

9

from its existing bank accounts to the new Sandy Spring Bank DIP accounts, and closing all of its pre-petition bank accounts other than the HCVP Account.

33. Through the Bank Account Motion, the Debtor is seeking authority to continue to maintain the HCVP Account post-petition solely to receive electronic deposits from DCHA due to the Debtor under the HCVP.

34. Transferring the registered account with DCHA from the HCVP Account to a newly established DIP account would likely be an involved process and take a considerable amount of time to complete. Transferring the registered deposit account could also potentially cause delay in the Debtor receiving funds due to the Debtor under the HCVP, which is crucial to Debtor maintaining timely payment of its monthly obligations. Accordingly, the Debtor believes it to be in the best interest of the estate to maintain the HCVP Account post-petition as the registered account to receive monthly deposits from DCHA due under the HCVP.

35. The Debtor understands and is prepared to implement the procedures set forth in the Bank Account Motion for maintaining and operating the HCVP Account for the duration of the case unless otherwise ordered by the Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 2, 2021.

                                                                                Tina Shaw, Chief Financial Officer
                                                                                Stanton Glenn Limited Partnership